IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DAVID MAZZA, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) Civil Act. No. 04-30020-MAP |
| VERIZON SICKNESS AND ACCIDENT | ) |
| DISABILITY BENEFIT PLAN FOR | ) |
| NEW ENGLAND ASSOCIATES, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## **DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Defendants Verizon Sickness and Accident Disability Benefit Plan for New England Associates (the "Plan") and Verizon Communications Inc. ("Verizon" or the "Company") (collectively, the "Verizon Defendants") submit this memorandum of law in support of their motion for summary judgment pursuant to Fed. R. Civ. P. 56.

### **INTRODUCTION**

Plaintiff commenced this action under section 502(a)(1)(B) of the Employee Retirement Income Security Act ("ERISA") seeking disability benefits under the Plan. Notwithstanding evidence in the administrative record to the contrary, plaintiff contends that he is disabled and unable to work due to back pain. As demonstrated below, however, the Verizon Defendants are entitled to summary judgment for a number of reasons. As a threshold matter, plaintiff's claim against Verizon must fail because it is not a proper defendant. In addition, the Verizon Defendants are entitled to judgment as a matter of law because the denial of plaintiff's claim under the Plan was based on a thorough examination of the administrative record and supported by medical evidence by plaintiff's own treating physicians and independent medical reviewers.

Accordingly, the denial of plaintiff's claim for sickness disability benefits under the Plan was not arbitrary and capricious.

## STATEMENT OF UNDISPUTED FACTS

The following undisputed facts are contained in the administrative record of plaintiff's claim under the Plan as set forth in the Agreed Amended Record for Judicial Review.[1]

## I.     Relevant Terms of the Plan

The Plan is "an 'employee benefit plan' within the meaning of Section 3(1) of ERISA, and an accident and health plan under Section 105 of the Internal Revenue Code of 1986," which "provide[s] for the payment of definite amounts to [Verizon's] Employees when they are disabled by accident or sickness." (VER MAZ 124) (Plan at § 1.) Verizon is the plan sponsor for the Plan (VER MAZ 127) (Plan at § 3.1), and the Chairman of Verizon's Bell Atlantic Corporate Employees' Benefits Committee is the designated plan administrator (VER MAZ 125, 127) (Plan at §§ 2, 3.1).

### A.     Sickness Disability Benefits Under the Plan

Section 4.1 of the Plan sets forth the eligibility requirements for receiving sickness disability benefits under the Plan. That section provides that:

> All Employees whose term of employment with the Employing Company is six (6) or more months shall become participants in the Sickness Disability Benefit portions of the Plan and be qualified to receive payments under the Plan on account of physical disability to work by reason of sickness. Such payments are hereinafter referred to as "Sickness Disability Benefits." Such payments shall terminate when disability ceases and shall in no case extend beyond the periods hereinafter mentioned. For the purposes of the Plan, a sickness shall include an injury other than accidental injury arising out of and in the course of employment by the Employing Company.

---

[1]     Citations to the administrative record will be identified as ("VER MAZ [ ]").

(VER MAZ 130) (Plan at § 4.1.)  Participants who have accrued between 20 and 25 full years of service, such as plaintiff here, are eligible to receive sickness disability benefits in the amount of full-pay for 39 weeks and half-pay for 13 weeks.  (VER MAZ 130) (Plan at § 4.2.)

To apply for sickness disability benefits, a participant must provide notice to the Company on his first day of absence due to disability.  (VER MAZ 135, 151) (Plan at § 6.5; SPD at 8.)  On the eighth consecutive calendar day of absence, the participant's supervisor will file appropriate papers with Aetna Life Insurance Company ("Aetna") to commence the participant's application for sickness disability benefits.  (VER MAZ 151) (SPD at 8.)  The Plan provides that sickness disability benefits "shall begin on the eight (8th) calendar day of absence on account of disability[.]"  (VER MAZ 130) (Plan at § 4.3.)

B.    Adjudication of Benefit Claims Under the Plan

Aetna is the "Benefits Administrator" for the Plan and has responsibility for making initial determinations of claims for benefit payments under the Plan.  (VER MAZ 173) (SPD at 30.)  The Verizon Claims Review Committee ("CRC") is the designated "Claims and Appeals Administrator" for the Plan.  (VER MAZ 173) (SPD at 30.)  In this role, the CRC has "the sole authority to exercise discretion in the resolution of any initial appeal of a denied claim under the Plan."  (VER MAZ 128) (Plan at § 3.3.1.)  The summary plan description for the Plan specifically provides that the CRC has discretionary authority to:

- Interpret the Plan[] based on their provisions and applicable law and make factual determinations about claims arising under the Plan[]

- Determine whether a claimant is eligible for benefits

- Decide the amount, form and timing of benefits

- Resolve any other matter under the Plan[] that is raised by a participant or a beneficiary, or that is identified by either the claims or appeals administrator.

3

(VER MAZ 167) (SPD at 24.)  The decision of the CRC is the "final, conclusive and binding administrative remedy under the Plan."  (VER MAZ 128) (Plan at § 3.3.2.)

## II.  **Plaintiff's Claim Under the Plan**

Plaintiff commenced his employment with the Company on August 1, 1979 and worked as a customer service representative.  (VER MAZ 5) (CRC Agenda at 1.)  Plaintiff's job was sedentary in nature, and involved talking on a telephone using a headset and working on a computer.  (VER MAZ 83) (Dasco 5/28/02 Letter at 1.)

Plaintiff, who is currently 48 years old, reported back problems since the age of 26 following a skiing accident.  (VER MAZ 83) (Dasco 5/28/02 Letter at 1.)  Plaintiff reported that his condition has progressively worsened since 1996.  (VER MAZ 83) (Dasco 5/28/02 Letter at 1.)  His first day of absence due to his back condition was May 21, 2002.[2]  On May 28, 2002, plaintiff's supervisor notified Aetna of plaintiff's absence to initiate his application for sickness disability benefits under the Plan.  (VER MAZ 50) (Aetna Notes at 27.)  Plaintiff never returned to work and was terminated on September 8, 2002.  (VER MAZ 5) (CRC Agenda at 1.)

### A.    Determination of Plaintiff's Initial Claim by Aetna

In determining plaintiff's initial claim, Aetna obtained the following information:

- On June 5, 2002, Aetna contacted Dr. Demosthenes Dasco, plaintiff's neurosurgeon, by telephone.  Dr. Dasco stated that plaintiff suffered from lower back pain syndrome with mild radiculopathy due to degenerative disc disease, and recommended physical therapy three times a week.  However, Dr. Dasco stated that plaintiff was capable of doing desk work provided that he be able to stand and sit as needed.  (VER MAZ 47-A) (Aetna Notes at 24.)

---

[2]    According to notes of a telephone call from Aetna to his supervisor, Elizabeth Mullins, plaintiff took a number of days off and was suspended for several days from May 8 to May 17, 2002.  Plaintiff's last day of work was May 20, 2002, when he returned to work for 15 minutes and subsequently left complaining of back pain.  (VER MAZ 48) (Aetna Notes at 25.)

- Aetna attempted to contact Dr. Robert Trump, plaintiff's internist, on June 4, 2002, but was unable to obtain any information on plaintiff's condition because his office was closed. (VER MAZ 48) (Aetna Notes at 25.)

Based on this information, Aetna denied plaintiff's claim on June 6, 2002, stating that he had not provided any clinical information to establish disability. (VER MAZ 47-A) (Aetna Notes at 24.)

After its initial denial, Aetna received additional information from Dr. Trump:

- On June 6, 2002, Aetna received a telephone call from Dr. Trump, stating that plaintiff suffered from lower back pain and failed physical therapy and injection therapy. However, Dr. Trump stated that plaintiff was able to work provided that he could stand and change positions at will. (VER MAZ 47) (Aetna Notes at 23.)

- Also on June 6, 2002, Aetna received a completed medical questionnaire from Dr. Trump via facsimile. Dr. Trump noted that plaintiff had chronic discogenic low back pain with sciatica. Nevertheless, Dr. Trump noted that plaintiff "can return to work [with] sit/stand arrangement" that would allow him to "adjust his position at intervals that may be as often as every hour for 5-10 minutes. If his work would agree, I expect a trial would safely be undertaken as per our phone call earlier today." (VER MAZ 92) (Trump 6/6/02 Questionnaire at 1.)

On June 6, 2002, Aetna concluded that this additional information was "not sufficient to warrant a reversal of our claim decision at this level," and informed plaintiff that he could further appeal his denial to Aetna's Disability Appeals Unit. (VER MAZ 47) (Aetna Notes at 23.)

B.    Determination of Plaintiff's First Appeal by Aetna

On July 18, 2002, plaintiff appealed Aetna's denial of his claim and submitted additional medical information for consideration. (VER MAZ 74-75) (Plaintiff 7/18/02 Letter at 1-2.) By letter dated July 25, 2002, Aetna acknowledged receipt of plaintiff's appeal. (VER MAZ 54) (Aetna 7/25/02 Letter at 1.) In addition to the aforementioned information from Dr. Dasco and Dr. Trump, Aetna reviewed the following information in its determination of plaintiff's appeal:

- Various MRIs from March and August 1998. (VER MAZ 76-81) (1998 MRI Reports at 1-6.)

- A discharge note from Dr. Trump dated May 20, 2002. Dr. Trump stated that plaintiff suffered from continuing pain and that he was unable to work. Dr.

Trump, however, noted that plaintiff needed "to be seen by a person with greater experience to do more formal evaluation." (VER MAZ 82) (Trump 5/20/02 Discharge Instructions at 1.) Dr. Trump referred plaintiff to Dr. Dasco. (VER MAZ 83) (Dasco 5/28/02 Letter at 1.)

- A letter by Dr. Dasco dated May 28, 2002. Dr. Dasco stated that plaintiff reported having a history of low back problems since age 26 and that his back pain had progressively worsened over the previous six years. Plaintiff also reported that sitting aggravated his pain, but that he was "able to walk without too much difficulty[,]" including "going into the woods doing some shooting as a sport." (VER MAZ 83) (Dasco 5/28/02 Letter at 1.) Dr. Dasco stated that plaintiff "has a chronic low back syndrome with mild radiculopathy bilaterally due to degenerative disc disease. His problem has frequent remissions and exacerbations." However, Dr. Dasco concluded that plaintiff was "capable of doing deskwork provided that he has the freedom of standing and sitting as needed." (VER MAZ 84) (Dasco 5/28/02 Letter at 2.)

- A letter from Dr. Trump to Aetna dated June 10, 2002. Although Dr. Trump reiterated that plaintiff suffered from chronic low back pain, he recommended that "as a trial, [plaintiff] might be allowed back into the workplace with a kind of sit/standing opportunity, noting that he might reposition himself at periods of time as often as several times during any given hour. If his workplace could accommodate to that, he would certainly be able to do as a trial that job." (VER MAZ 85-86) (Trump 6/10/02 Letter at 1-2.)

- Referral dated June 10, 2002 by Dr. Trump to see Dr. Bentley Ogoke, a pain management specialist. (VER MAZ 87) (Trump 6/10/02 Referral at 1.)

- An initial medical evaluation by Dr. Ogoke dated June 12, 2002. Dr. Ogoke listed the following diagnoses: (1) lumbar herniation at L4-5, L5-S1, and LS-4; (2) lumbar facet degenerative disease; (3) sacroilitis; (4) lumbar radiculopathy; (5) thoracic strain, rule out herniation versus discogenic pain at the lower thoracic spine. (VER MAZ 73) (Ogoke 6/12/02 Evaluation at 4.) Dr. Ogoke's treatment plan included medication, physical therapy, bioelectric treatment, MRIs, and spinal injections. (VER MAZ 73) (Ogoke 6/12/02 Evaluation at 4.) Dr. Ogoke did not indicate whether plaintiff could work.

- MRI reports dated June 13, 2002 indicating a T10-11 disc bulge with effacement of L3 nerve root, left L3-4 disc herniation, left L4-5 and paracentral L5-S1 disc herniations. (VER MAZ 89-90) (2002 MRI Reports at 1-2.)

- On June 14, 2004, Aetna spoke with plaintiff's supervisor, Elizabeth Mullins, who stated that plaintiff could be accommodated with a standing and sitting arrangement. Specifically, plaintiff could stand and move around his workstation wearing a headset with a long cord. In addition, plaintiff had already been

provided with an ergonomically appropriate workstation and chair before his absence. (VER MAZ 44) (Aetna Notes at 19.)

- Procedure notes indicating that plaintiff received epidural steroid injections on July 23, 2002 (VER MAZ 68) (Injection #1 Note at 1), August 20, 2002 (VER MAZ 66) (Injection #2 Note at 1), and September 17, 2002 (VER MAZ 61) (Injection #3 Note at 1).

- Office notes from Dr. Ogoke with respect to follow-up visits by plaintiff on July 1, 2002 (VER MAZ 69) (Ogoke 7/1/02 Office Note at 1), August 7, 2002 (VER MAZ 67) (Ogoke 8/7/02 Office Note at 1), September 3, 2002 (VER MAZ 64-65) (Ogoke 9/3/02 Office Note at 1-2), and September 13, 2002 (VER MAZ 62-63) (Ogoke 9/13/02 Office Note at 1-2). Although plaintiff still reported lower back pain, Dr. Ogoke noted that medical treatment had a positive effect on plaintiff's condition. Specifically, plaintiff reported that he had a good response to injection therapy (VER MAZ 64) (Ogoke 9/3/02 Office Note at 1), and his physical therapist also reported that he was "obtaining good relief" with physical therapy (VER MAZ 62) (Ogoke 9/13/02 Office Note at 1). In a September 6, 2002 facsimile to Aetna, plaintiff confirmed that he "now [has] some relief on some of the pain and [his] breathing is better." (VER MAZ 96) (Plaintiff 9/6/02 Fax at 2.)

- A September 23, 2002 letter from Donna Desrocher, plaintiff's physical therapist. Ms. Desrocher opined that plaintiff was "not able to work sitting at his job [at] Verizon - at this time." (VER MAZ 94) (Desrocher 9/23/03 Letter at 1.)

- A letter from Dr. Trump dated September 25, 2002. Dr. Trump noted that plaintiff continued to report severe back pain. Dr. Trump stated that plaintiff was undergoing physical therapy with some improvement, and that injection therapy "provided significant benefit[.]" (VER MAZ 57) (Trump 9/25/02 Letter at 1.) Dr. Trump also stated that "some of this improvement may be secondary to pharmacologic manipulation and not indeed physical improvement on [plaintiff's] part." (VER MAZ 57) (Trump 9/25/02 Letter at 1.) He opined that plaintiff "is not presently able to work in any capacity and I don't have any knowledge as to when that status may change." (VER MAZ 58) (Trump 9/25/02 Letter at 2.)

- On November 7, 2002, Aetna contacted Dr. Ogoke's office and spoke with his physician's assistant, Allison St. Laurent. Ms. St. Laurent indicated that Dr. Ogoke did not complete any disability forms for plaintiff. She also did not know whether Dr. Ogoke was aware that plaintiff's employer would accommodate him with an ergonomically correct workstation and allow him to change his position as necessary. When asked whether plaintiff was capable of work with these accommodations, she responded that plaintiff could work at least part-time so long as he could alternate between sitting and standing as needed. (VER MAZ 22) (Hix Amended Report at 7.)

7

- Plaintiff's claim file was forwarded to Aetna's medical director, Dr. Claudia Hix, for review. Dr. Hix noted that on or around May 28, 2002, plaintiff was able to hunt which "involves walking, stationary positions, sitting, laying on the ground or in a blind, bending, stooping, squatting, reaching to shoulder height, and occasionally climbing. By extension, it could be expected that the patient would be able to sit at a desk with frequent changes of position for some period of time during the workday." (VER MAZ 15) (Hix Report at 2.) Dr. Hix also found that Dr. Ogoke's examination of plaintiff in June 2002 was consistent with Dr. Dasco's May 28, 2002 evaluation, which indicated that plaintiff could work. With respect to Dr. Trump's September 25, 2002 letter stating that plaintiff was incapable of work, Dr. Hix found that the letter "contains subjective information only." (VER MAZ 17) (Hix Amended Report at 2). Dr. Hix also noted that Ms. St. Laurent opined on November 7, 2002 that plaintiff was able to work. (VER MAZ 16) (Hix Amended Report at 1.) In addition, Dr. Hix stated that there may be a possibility of misrepresentation by plaintiff based on inconsistencies in the documentation provided by his physicians. (VER MAZ 17-18) (Hix Amended Report at 2-3.)

Based on the foregoing information, Aetna denied plaintiff's appeal on November 8, 2002, stating that "[t]he clinical information does not support an inability to perform your sedentary occupation with restrictions and previously made accommodations by your employer . . . . There was no objective evidence provided to indicate that you were physically unable to perform sedentary work." (VER MAZ 13) (Aetna 11/8/02 Denial Letter at 4.)

C.    Determination of Plaintiff's Final Appeal by the CRC

By letter dated December 9, 2002, plaintiff appealed Aetna's denial of his claim. (VER MAZ 5, 108-115) (CRC Agenda at 1; Collins 12/9/02 Letter at 1-8.) Plaintiff also submitted the following additional information:

- A letter from Dr. Ogoke dated November 7, 2002 summarily stating that plaintiff "cannot work due to his physical impairments including the inability to sit and stand for long periods of time in a sedentary position from Lumbar Herniation at L4-5, L5-S1 and L3-4 protrusion, Lumbar Facet Degenerative Disease, Sacroilitis, Lumbar Radiculopathy, and Thoracic Strain." (VER MAZ 113) (Ogoke 11/7/02 Letter at 1.)

Verizon forwarded plaintiff's claims file to Dr. Rukhsana Sadiqali for her independent medical review. In a report dated January 13, 2003, Dr. Sadiqali made the following observations:

- On May 28, 2002, Dr. Tasco found that plaintiff "was capable of performing desk duty with ability to sit and stand as needed." (VER MAZ 8) (Sadiqali Report at 1.) Likewise, on June 6, 2002, Dr. Trump "also stated that [plaintiff] was able to work at his job as long as he was able to stand and change his position at will. When contacted, [plaintiff's] supervisor indicated that the employee worked at an ergonomically correct workstation where he was able to stand and move around. He was also accommodated with a headset with a long cord." (VER MAZ 8) (Sadiqali Report at 1.)

- Dr. Ogoke's office notes indicated that epidural injections and physical therapy "had resulted in improvement of [plaintiff's] symptoms. Dr. Ogoke in his note[s], did not indicate that [plaintiff] needed to be out of work, nor did he address [plaintiff's] functional capacity." (VER MAZ 8) (Sadiqali Report at 1.)

- On November 7, 2002, a physician's assistant in Dr. Ogoke's office "indicated that [plaintiff] was able to work, at least part time, as long as he could alternate sitting and standing as needed." (VER MAZ 8) (Sadiqali Report at 1.)

- Although Dr. Trump and Dr. Ogoke stated that plaintiff could not work in their September 25, 2002 and November 7, 2002 letters, these opinions were not based on "objective clinical information to warrant disability." (VER MAZ 8) (Sadiqali Report at 1.)

Accordingly, Dr. Sadiqali concluded that, "[a]lthough [plaintiff] did have back pain, there is no objective information to support [his] inability to do the job with the recommended accommodations." (VER MAZ 9) (Sadiqali Report at 2.)

After a thorough examination of the administrative record, the CRC upheld the denial of plaintiff's claim by letter dated February 4, 2003. (VER MAZ 3) (CRC Denial Letter at 3.) The CRC found that on May 28, 2002, "Dr. Dasco noted that [plaintiff] was capable of doing desk duty with the ability to stand and sit as needed." (VER MAZ 2) (CRC Denial Letter at 2.) The CRC also found that on June 6, 2002, "Dr. Trump stated that [plaintiff] could return to work as long as he had the ability to sit and stand when necessary." (VER MAZ 2) (CRC Denial Letter at 2.) In addition, the CRC noted that Dr. Ogoke's examination on June 12, 2002 indicated that plaintiff's "sensory, motor, and power of upper extremities and lower extremities were within normal limits[,]" and that his "concentration, judgment, coordination, and balance were good."

(VER MAZ 2) (CRC Denial Letter at 2.)  Furthermore, the CRC also noted that Dr. Ogoke's

September 3, 2002 office notes indicated that plaintiff had a positive response from injection

therapy.  The CRC emphasized that Dr. Ogoke's records do not contain any opinions whether

plaintiff needed to be out of work.  (VER MAZ 2-3) (CRC Denial Letter at 2-3.)

The CRC also considered and addressed the opinions of Ms. Desrocher, Dr. Trump, and

Dr. Ogoke that plaintiff was unable to work.  With respect to Ms. Desrocher's September 23,

2002 letter, the CRC found that she "did not provide any clinical evidence to support her

recommendation."  (VER MAZ 3) (CRC Denial Letter at 3.)  Similarly, the CRC emphasized

that Dr. Trump's September 25, 2002 letter was based only on subjective information provided

by plaintiff.  (VER MAZ 3) (CRC Denial Letter at 3.)  Likewise, the CRC found that Dr.

Ogoke's November 7, 2002 letter lacked evidence "to substantiate a total disability from

[plaintiff's] own occupation."  (VER MAZ 3) (CRC Denial Letter at 3.)  Accordingly, the CRC

concluded that plaintiff was not entitled to disability benefits for the period after May 28, 2002.

D.    Procedural History

On February 2, 2004, plaintiff filed a three-count complaint in this action against the

Verizon Defendants and Aetna.  [Dkt. #1.]  In count I, plaintiff brought a claim against the

Verizon Defendants[3] under ERISA § 502(a)(1)(B) alleging that the denial of his claim for

benefits was arbitrary and capricious.  (Compl. ¶ 21.)  Plaintiff also brought a § 502(a)(1)(B)

claim against Aetna in count II.  (Compl. ¶¶ 22-23.)  In count III, plaintiff brought a state law

---

[3]       Count I identifies Verizon as the only defendant against which this claim is brought.
(Compl. at p.9) ("Count I—Violations of ERISA § 502(a)(1)(B)—Verizon.)  Presumably,
plaintiff also intends to bring this claim against the Plan.  (Compl. at p.1 n.1) (alleging that the
terms of the Plan provide that "[t]he Plan is the proper named defendant for any lawsuit relating
to a clam for benefits under the Plan").

claim against Aetna for violations of M.G.L. Chapter 176D.  (Compl. ¶¶ 24-32.)  Plaintiff also requested a jury trial.  (Compl. at p.13.)

On April 13, 2004, the Verizon Defendants answered plaintiff's complaint.  [Dkt. # 10.]  Aetna filed a motion to dismiss on April 13, 2004, asserting that it was not a proper defendant with respect to count II and that ERISA preempted count III.  [Dkt. # 5, 6.]  Aetna also moved to strike plaintiff's request for a jury demand.  [Dkt. # 7.]  By Memorandum and Order dated September 17, 2004, the Court granted Aetna's motions.  [Dkt. # 17.]  At a conference before the Court on November 22, 2004, the Verizon Defendants orally moved to strike plaintiff's demand for a jury trial.  Plaintiff did not oppose, and the Court granted the motion.  Pursuant to the Court's Order Regulating Proceedings (Judicial Review of Out-of-Court Nongovernmental Decisions) dated November 22, 2004 [Dkt. # 22], the Verizon Defendants and plaintiff jointly filed a Notice of Agreement of Standard of Review on March 2, 2005 [Dkt. # 23], setting forth the parties' agreement that an arbitrary and capricious standard of review is applicable in this case.  In addition, the parties also agreed with respect to the administrative record to be review by the Court, which is contained in the Agreed Amended Record for Judicial Review.

**ARGUMENT**

**I.**   **Plaintiff's ERISA § 502(a)(1)(B) Claim Should Be Dismissed With Respect to Verizon Because it is Not a Proper Defendant**

ERISA § 502(a)(1)(B) allows a participant or beneficiary to bring an action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).  Claims brought under § 502(a)(1)(B), however, must be brought against the plan itself or the administrator of the plan, and not the employer or plan sponsor.  *See Terry v. Bayer Corp.*, 145 F.3d 28, 36 (1st Cir. 1998) ("[T]he proper party defendant in an action concerning ERISA

benefits is the party that controls administration of the plan") (quoting *Garren v. John Hancock Mut. Life Ins. Co.*, 114 F.3d 186, 187 (11th Cir. 1997)); *DiGregorio v. PriceWaterhouseCoopers Long Term Disability Plan*, No. 03-11191-DPW, 2004 U.S. Dist. LEXIS 15485, at *45-48 (D. Mass. Aug. 9, 2004) (noting that the proper party in a § 502(a)(1)(B) claim is the plan administrator); *see also Layes v. Mead Corp.*, 132 F.3d 1246, 1249 (8th Cir. 1998) (holding that plan administrator, not employer, was proper party defendant); *Daniel v. Eaton Corp.*, 839 F.2d 263, 266 (6th Cir. 1988) ("Unless an employer is shown to control administration of a plan, it is not a proper party defendant in an action concerning benefits").

As noted, the CRC is the designated Appeals Administrator responsible for the adjudication of claims submitted under the Plan, and its decisions are final and binding.  (VER MAZ 166-67) (SPD at 23-24.)  In addition, the Plan specifically designates the Chairman of Verizon's Bell Atlantic Corporate Employees' Benefits Committee as the plan administrator. (VER MAZ 125, 127) (Plan at §§ 2, 3.1.)  Accordingly, because Verizon is not the Appeals Administrator or the plan administrator for the Plan, it is not a proper defendant in an action for benefits under § 502(a)(1)(B), and is entitled to summary judgment dismissing this claim.

## II.    **The CRC's Denial of Plaintiff's Claim Under the Plan Should Be Upheld**

### A.    The Court Must Review the CRC's Denial of Plaintiff's Claim Under a Deferential Arbitrary and Capricious Standard

If an ERISA plan vests discretionary authority in its plan administrator to interpret the plan's terms and adjudicate claims, the Court's role on judicial review is limited to deciding whether the plan administrator's denial of benefits under the terms of the plan was arbitrary and capricious.  *See Recupero v. New England Tel. & Tel. Co.*, 118 F.3d 820, 827 (1st Cir. 1997) ("[W]hen the benefit plan gives the administrator or fiduciary discretion to determine benefit eligibility or construe plan terms, [*Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115

(1989)] and its progeny mandate a deferential 'arbitrary and capricious' standard of judicial review"); *Gannon v. Metro. Life Ins. Co.*, 360 F.3d 211, 212-13 (1st Cir. 2004) ("When . . . a plan administrator has discretion to determine the applicant's eligibility for and entitlement to benefits, the administrator's decision must be upheld unless it is 'arbitrary, capricious, or an abuse of discretion' ") (citation omitted).

Under the arbitrary and capricious standard, the administrator's decision must be upheld if "it is reasoned and supported by substantial evidence." *Gannon*, 360 F.3d at 213 (citing *Vlass v. Raytheon Employees Disability Trust*, 244 F.3d 27, 30 (1st Cir. 2001)). "Substantial evidence . . . means evidence reasonably sufficient to support a conclusion. Sufficiency, of course, does not disappear merely by reason of contradictory evidence." *Doyle v. Paul Revere Life Ins. Co.*, 144 F.3d 181, 184 (1st Cir. 1998). In other words, the question is "not which side [the court] believe[s] is right, but whether [the administrator] had substantial evidentiary grounds for a reasonable decision in its favor." *Matias-Correa v. Pfizer, Inc.*, 345 F.3d 7, 12 (1st Cir. 2003) (citation omitted). Furthermore, because a court under an arbitrary and capricious standard is limited to reviewing the reasonableness of the plan administrator's decision based upon the facts before the administrator at the time the decision was made, the court cannot consider other facts or other documents not before the plan administrator at the time of its decision. *See*, *e.g.*, *Lopes v. Metropolitan Life Ins. Co.*, 332 F.3d 1, 5 (1st Cir. 2003) ("Review of the administrative record for reasonableness logically implies review of the record available to the plan administrator; it is anomalous to suggest that an administrator acted unreasonably 'by ignoring information never presented to it'") (citation omitted); *Downey v. Aetna Life Ins. Co.*, No. 02-10103-DPW, 2003 U.S. Dist. LEXIS 8150, at *37 (D. Mass. May 12, 2003) ("The arbitrary and capricious . . .

standard requires courts to look exclusively to the administrative record relied upon by the ERISA fiduciary in reaching its conclusion").

As noted above, under the terms of the Plan, the CRC was the Appeals Administrator and had full discretion and authority to interpret the terms of the Plan and adjudicate claims for benefits. (VER MAZ 166-67) (SPD at 23-24.) As such, the parties agreed that the arbitrary and capricious standard of review is applicable here. Notice of Agreement of Standard of Review [Dkt. # 23]. The parties also agreed that the Court's review of the CRC's decision is limited to the administrative record as set forth in the Agreed Amended Record for Judicial Review.

B.     The CRC's Denial of Plaintiff's Claim Was Not Arbitrary and Capricious

The CRC's denial of plaintiff's claim for sickness disability benefits effective May 28, 2002 should be upheld because it was based on substantial evidence in the administrative record and thus not arbitrary and capricious. In its February 4, 2003 denial letter, the CRC emphasized that plaintiff's own treating physicians concluded that he was not disabled on or around May 28, 2002. Specifically, the CRC found that on May 28, 2002, Dr. Dasco indicated that plaintiff was "capable of doing desk duty with the ability to stand and sit as needed." (VER MAZ 2) (CRC Denial Letter at 2.) Dr. Dasco's also noted that plaintiff was "able to walk without too much difficulty and has been going into the woods doing some shooting as a sport." (VER MAZ 83) (Dasco 5/28/02 Letter at 1.) In a subsequent conversation with Aetna on June 5, 2002, Dr. Dasco reaffirmed his conclusion that plaintiff was able to work with a sit and stand accommodation. (VER MAZ 47-A) (Aetna Notes at 24.)

Similarly, the CRC emphasized in its denial letter that on June 6, 2002, Dr. Trump concluded that plaintiff "could return to work as long as he had the ability to sit and stand when necessary." (VER MAZ 2) (CRC Denial Letter at 2.) Dr. Trump also made the same statement

in a telephone conversation with Aetna the same day.  (VER MAZ 47) (Aetna Notes at 23.)

Furthermore, in a June 10, 2002 letter, Dr. Trump recommended that "as a trial, [plaintiff] might

be allowed back into the workplace with a kind of sit/standing opportunity, noting that he might

reposition himself at periods of time as often as several times during any given hour.  If his

workplace could accommodate on that, he would certainly be able to do as a trial that job."[4]

(VER MAZ 85-86) (Trump 6/10/02 Letter at 1-2.)  On June 14, 2002, Plaintiff's supervisor

stated that plaintiff could be accommodated with a standing/sitting arrangement, allowing him to

move around his workstation using a headset with a long cord.  (VER MAZ 44) (Aetna Notes at

19.)  Plaintiff, however, never attempted to work with these accommodations and did not return

to work after May 21, 2002.  (VER MAZ 5) (CRC Agenda at 1.)

    Subsequent office notes from Dr. Ogoke during the period from June 12 to September

13, 2002 also do not support a finding of disability.  As the CRC noted in its denial letter, Dr.

Ogoke did not mention in any of these notes that plaintiff needed to be out of work.  (VER MAZ

2-3) (CRC Denial Letter at 2-3.)  Indeed, these office notes indicate that plaintiff had positive

results with physical therapy and epidural injection treatment.  (VER MAZ 62, 64) (Ogoke

9/13/02 Office Note at 1; Ogoke 9/3/02 Office Note at 1.)  Plaintiff stated on September 6, 2002

that with this treatment, he "now [has] some relief on some of the pain and [his] breathing is

better."  (VER MAZ 96) (Plaintiff 9/6/02 Fax at 2.)

---

[4]      Although Dr. Trump initially opined that plaintiff was unable to work in a May 20, 2002
discharge note, he stated that plaintiff "need[ed] to be seen by a person with greater experience
to do more formal evaluation[,]" (VER MAZ 82) (Trump 5/20/02 Discharge Instruction at 1),
and referred the plaintiff to Dr. Dasco (VER MAZ 83) (Dasco 5/28/02 Letter at 1).  As noted
above, Dr. Dasco concluded that plaintiff was able to work after a comprehensive examination.
Dr. Trump subsequently stated that plaintiff could return to work with appropriate
accommodations.

It was not until September 25, 2002 that one of plaintiff's treating physicians, Dr. Trump, opined that plaintiff was unable to work.  (VER MAZ 58) (Trump 9/25/02 Letter at 2.)  The CRC, however, emphasized that Dr. Trump's statement was based only on "subjective information" provided by the plaintiff.  (VER MAZ 3) (CRC Denial Letter at 3.)  In addition, the CRC reasonably rejected the opinion of plaintiff's physical therapist that he was unable to work because the "therapist did not provide any clinical evidence to support her recommendation." (VER MAZ 3) (CRC Denial Letter at 3.)  Likewise, in his November 7, 2002 letter, Dr. Ogoke provided no medical evidence to support his statement that plaintiff was unable to work.[5]  There is no indication that Dr. Ogoke was even aware that plaintiff was offered appropriate accommodations by his employer.  (VER MAZ 22) (Hix Amended Report at 7.)  When subsequently asked whether plaintiff could work with such accommodations, Dr. Ogoke's physician's assistant responded that plaintiff was capable of work provided he could alternate between sitting and standing.  (VER MAZ 22) (Hix Amended Report at 7.)  In any event, the

---

[5]     Dr. Ogoke's November 7, 2002 letter merely stated the following:

1.  [Plaintiff] has been on numerous medication including Percocet 5 mg, Skelaxin 400 mg, Elavil 25mg, Mobic 7.5 mg.

2.  [Plaintiff has not reported pleuritic chest pain, however, his first evaluation he reported shortness of breath when he has back spasms.

3.  The patient indicated he was out of work from the initial comprehensive evaluation on June 12, 2002 due to pain.

4.  [Plaintiff] cannot work due to his physical impairments including the inability to sit and stand for long periods of time in a sedentary position from Lumbar Herniation at L4-5, L5-S1 and L3-4 protrusion, Lumbar Facet Degenerative Disease, Sacroilitis, Lumbar Radiculopathy, and Thoracic Strain.

(VER MAZ 113) (Ogoke 11/7/02 Letter at 1.)

September 2002 opinions of Dr. Trump and Ms. Desrocher, and the November 2002 opinion of

Dr. Ogoke, were made *four and six months after* plaintiff's purported date of disability. [6]

The CRC's determination that these opinions were insufficient to establish disability is

further supported by the independent medical review of Dr. Sadiqali, who found "no objective

information to support [plaintiff's] inability to do the job with the recommended

accommodations." (VER MAZ 9) (Sadiqali Report at 2.) Indeed, the First Circuit and this Court

have held that such a lack of objective medical evidence can be fatal to a plaintiff's claim for

benefits. *See*, *e.g.*, *Boardman v. Prudential Life Ins. Co.*, 337 F.3d 9, 17 n.5 (1st Cir. 2003)

(noting that it was proper for administrator to require "objective evidence that [her] illnesses

rendered her unable to work"); *Ivy v. Raytheon Employees Disability Trust*, 307 F. Supp. 2d 301,

308 (D. Mass. 2004) (concluding that it was reasonable for administrator to request objective

medical evidence to establish disability, and rejecting plaintiff's argument that she was never

informed of the need for such objective evidence because "[w]hen [plaintiff's] benefits were first

terminated, [the administrator] informed her that she had failed to submit objective evidence of

her functional limitations"); *Downey*, 2003 U.S. Dist. LEXIS 8150, at *45-48 (treating

physicians' conclusory statements that plaintiff was disabled, without providing objective

medical evidence, insufficient to establish disability).

Furthermore, plaintiff's assertion that the CRC should afford paramount weight to Dr.

Trump's September 25, 2002 opinion and Dr. Ogoke's November 7, 2002 opinion (Compl. ¶¶

---

[6]     To the extent that plaintiff may contend that he should at least be entitled to benefits commencing on September 25, 2002, the date of Dr. Trump's statement of disability, his claim fails. The Plan explicitly provides that a participant dos not have any "right or claim to any benefit or allowance after discharge from the service of the Employing Company, *unless the right to such benefit has accrued prior to such discharge.*" (VER MAZ 135) (Plan at § 6.1) (emphasis added). As noted above, plaintiff's employment was terminated on September 8, 2002. (VER MAZ 5) (CRC Agenda at 1.)

17-18) is also unavailing. Although plan administrators "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician," *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003), the Supreme Court has nevertheless held that "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Id.*

The First Circuit and this Court have likewise upheld numerous decisions denying disability benefits despite contrary opinions by treating physicians.[7] For example, in *Gannon v. Metropolitan Life Ins. Co.*, 360 F.3d 211 (1st Cir. 2004), the plaintiff argued that the administrator's denial of her claim was arbitrary and capriciously because it failed to give greater weight to the opinions of two treating physicians. *Id.* at 215. The First Circuit nevertheless held that the administrator's denial was reasonable because it was based on other sufficient evidence in the administrative record, including the opinion of an independent medical reviewer,

---

[7]       *See, e.g., Matias-Correa*, 345 F.3d at 12 (rejecting plaintiff's argument that the administrator "should have given more weight to her doctors' diagnoses," and affirming denial of disability benefits where independent medical reviewer concluded that plaintiff could work for limited periods of time); *Leahy v. Raytheon Co.*, 315 F.3d 11, 19-21 (1st Cir. 2002) (upholding denial of disability benefits despite opinions from treating physicians to the contrary); *Crossman v. Raytheon Long Term Disability Plan*, No. 01-10928-RWZ, 2004 U.S. Dist. LEXIS 26480, at *3, 8-9 (D. Mass. Oct. 19, 2004) (finding report of independent medical reviewer "alone … provide[d] substantial evidence to support [administrator's] denial of benefits to plaintiff" despite differing opinions by treating physician, which "are not legally entitled to any special weight"); *McLaughlin v. Prudential Life Ins. Co.*, 319 F. Supp. 2d 115, 125-27 (D. Mass. 2004) (noting "[t]here is no requirement under ERISA that a plan administrator defer to the opinion of a claimant's treating physician[,]" and affirming denial of benefits despite "adverse aspects of the record on which the Medical Director could have relied in reaching a different conclusion"); *Guarino v. Metropolitan Life Ins. Co.*, 915 F. Supp. 435, 445 (D. Mass. 1995) ("the fact that there is a dispute between [plaintiff's] physicians and the other [independent] physicians does not establish arbitrary and capricious action . . . . [The administrator] had the discretion to interpret the Plan, weigh the evidence, and make its own final determination").

indicating that plaintiff was capable of work. *Id*. at 215-16. The First Circuit stated that "it was within the [administrator's] discretion to weigh that competing evidence to determine whether [plaintiff] was 'disabled' and hence whether she was entitled to continuing benefits . . . . [I]t is not [the court's] role to evaluate how much weight an [administrator] should have accorded the opinion of an independent medical consultant relative to the opinions of a claimant's own physicians." *Id*. at 216.

Similarly, in *Ivy v. Raytheon Employees Disability Trust*, 307 F. Supp. 2d 301 (D. Mass. 2004), this Court rejected the plaintiff's argument that the administrator's denial of disability benefits was improper because "it disregarded the prognoses of [her] treating doctors and relied exclusively on the conclusions of independent medical consultants." *Id*. at 306. Following *Black & Decker*, the Court stated that "[e]ven in the face of conflicting medical evidence, it is reasonable for the claim administrator to rely on the conclusions of independent medical consultants rather than conclusions of treating physicians." *Id*. The fact that the administrator "based its decision to terminate [her] benefits on the reports of reviewing physicians and did not accord more weight to her treating physicians and therapists is not, by itself, unreasonable." *Id*. at 307. Because plaintiff failed to provide objective medical evidence to support her claim, the Court held that the administrator's denial was not arbitrary and capricious. *Id*. at 307-08.

Likewise, deference should be afforded here to the CRC's in its considering of the competing evidence in the administrative record. In light of Dr. Sadiqali's independent medical review noting the lack of any objective medical evidence to support a finding of disability, as well as a number of opinions by plaintiff's own treating physicians at the commencement of the purported disability period that he was capable of work with appropriate accommodations, it was reasonable for the CRC to conclude that plaintiff was not disabled under the terms of the Plan.

Because the CRC's decision was based on substantial evidence in the administrative record, it was not arbitrary and capricious. Accordingly, the Court should uphold the CRC's denial of plaintiff's claim and grant the Verizon Defendants' motion for summary judgment.

## CONCLUSION

For the foregoing reasons, the Verizon Defendants are entitled to judgment as a matter of law. Accordingly, the Verizon Defendants respectfully request that the Court grant its motion for summary judgment and enter judgment in their favor.

Respectfully submitted on this 31st day of March, 2005:

_/s/ Karen M. Wahle_____
Karen M. Wahle
O'Melveny & Myers LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
Tel: (202) 383-5300

Amy D. Seifer, BBO #550639
Lisa M. Birkdale, BBO #549663
Verizon Communications Inc.
Legal Department
185 Franklin Street
Boston, MA 02110-1585
Tel: (617) 743-5764

Attorneys for Defendants
Verizon Communications Inc. and
Verizon Sickness and Accident Disability
Benefit Plan for New England Associates

<u>CERTIFICATE OF SERVICE</u>

     The undersigned certifies that the foregoing Defendants' Motion for Summary Judgment and Memorandum of Law in Support of Motion for Summary Judgment were electronically filed via CM/ECF for the United States District Court for the District of Massachusetts. In addition, a copies of the foregoing documents were served via first-class mail on this 31st day of March, 2005 on the following counsel of record:

        Anthony G. Collins
        121 State Street – Suite 102
        Springfield, MA 01103
        (413) 746-9003

        Counsel for Plaintiff

                                       /s/ Karen M. Wahle