UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

CIVIL ACTION NO. 04-30020-MAP

DAVID MAZZA,
              Plaintiff

vs.

VERIZON SICKNESS AND ACCIDENT
DISABILITY BENEFIT PLAN FOR
NEW ENGLAND ASSOCIATES, VERIZON
COMMUNICATIONS, INC., AETNA
CASUALTY AND LIFE INSURANCE
COMPANY,
              Defendants

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**PLAINTIFF'S MEMORANDUM OF
LAW IN SUPPORT OF MOTION
FOR SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. 56, the Plaintiff, David Mazza, hereby submits the following Memorandum of Law in support of his Motion for Summary Judgment. As noted in more detail below, the Defendant's denial of the Plaintiff's application for disability benefits was not reasoned or supported by substantial evidence in the record, and the Defendant's denial decision was unreasonable, arbitrary, capricious, and an abuse of discretion such that the Plaintiff's motion for summary judgment should be **ALLOWED**.

### STATEMENT OF FACTS

It should be noted at the outset that, as part of its

2

memorandum of law, the Defendant Verizon Sickness and Accident Disability Benefit Plan for New England Associates (hereinafter "Verizon") has set forth a rather comprehensive section entitled "Statement of Undisputed Facts"[1]. While for the most part Plaintiff concurs that the above referenced section contains "undisputed" facts derived from the agreed upon administrative record, there are numerous averments made by Verizon in the guise of objectivity which are actually more akin to argument or opinion than they are to literal fact. Also, in many instances Verizon simply presents an incomplete description of certain events or documents such that it bolsters their position. Hence, the Plaintiff would submit that Verizon has not promulgated an authentic statement of "undisputed" facts, but instead, a version of events presented in a light favorable to their argument.

Nevertheless, in the interest of brevity, the Plaintiff will refrain from repeating verbatim everything in Verizon's otherwise voluminous recitation of facts upon which the parties agree, and to that end, the following narrative is intended to point out only the information from the administrative record which may be in dispute, or which the Plaintiff feels to be material or dispositive to the instant matter. To that end, the Plaintiff would point to the following factors as crucial to a determination of whether Verizon's review and/or denial of the Plaintiff's short term disability claim was arbitrary and

---

[1] The Plaintiff agrees with and would adopt the "Procedural History" section which appears on pages 10 and 11 of Verizon's memorandum.

3

capricious as per the relevant legal standard. Again, while Verizon's memorandum sets out the factual background in great detail, it would appear that this type of itemization does a disservice to the court since it tends to obscure the ultimate issue here; namely what factors or evidence was available to Verizon at the time it denied the Plaintiff's disability claim. With that in mind, the following salient facts go right to the merits of the issues to be decided by the court[2]:

1. On or about August 1, 1979, the Plaintiff commenced employment with the Defendant Verizon.

2. At all times relevant, the Plaintiff was an employee working as a service representative for Verizon, a position which required that the Plaintiff engage in sitting and speaking on the telephone for prolonged periods of time, bending, twisting, and repetitive upper extremity movements involving administrative and/or computer duties.

3. Pursuant to his employment with the Defendant Verizon, the Plaintiff became enrolled in, was a member of, and at all times relevant was entitled to certain sickness or disability benefits available under the Verizon Sickness and Accident Disability Benefit Plan for New England Associates ("Plan"). Despite implications to the contrary made by Verizon, a review of the Plan (the pertinent portions of which appear at VER MAZ pp. 121-154) indicates that there are absolutely no provisions which delineate or mandate the form of medical documentation

---

[2] For purposes of uniformity, the Plaintiff will use the same designation of the record utilized by Verizon ("VER MAZ").

4

necessary to sustain a claim, and moreover, the Plan is devoid of any requirement that a claimant submit "objective" as opposed to "subjective" medical evidence in order to prevail in a claim for benefits. Similarly, the Plan neither expressly or impliedly indicates that "objective" medical evidence would carry more weight or be viewed be more favorably than "subjective" medical proof.

4. The Plaintiff first applied for disability benefits in May 2002. His original application for benefits was reviewed and denied by the third party administrator of the Plan at the time (and erstwhile Defendant) Aetna Life Insurance Company ("Aetna"), and thereafter, the Defendant Verizon denied the Plaintiff's appeal of Aetna's first level decision[3].

5. From the time Plaintiff first applied for disability benefits and at all points thereafter, Aetna and Verizon were provided with or privy to the following medical information regarding the Plaintiff David Mazza:

(a) At approximately twenty eight years old, the Plaintiff injured his lower back in a skiing accident, with the pain and other commensurate symptoms becoming increasing worse over the ensuing years. In fact, Mr. Mazza's pain, numbness, spasms, popping, tingling and other similar symptoms about his mid and lower back (with radiation to his extremities, hips, and buttocks) eventually became crippling, chronic and

---

[3] This court previously allowed Aetna's Motion to Dismiss the ERISA and M.G.L. c. 176D claims against it. The upshot of that dismissal, and result contemplated by the relevant federal case law, is that the actions and decisions taken by Aetna during the time it served as the Plan's third party administrator are now imputed to Verizon. See e.g. **Hall v. Labco**, 140 F.3d

5

debilitating. These symptoms were greatly exacerbated by sitting and other duties inherent in the Plaintiff's position as a service representative for the Defendant Verizon.

(b) During the period described in the preceding paragraph, the Plaintiff treated with a variety of physicians in an effort to try to alleviate the pain and symptoms in his back and extremities, and more important for present purposes, each of the records pertaining to the treatment of Mr. Mazza were made available to and/or reviewed by the Defendants as part of their disability review and decision. Specifically, as noted in various portions of the administrative record, the Plaintiff treated with (among others) the following physicians regarding his back condition: Robert E. Trump M.D. (his primary care physician); Demosthenes D. Dasco (a neurosurgeon); Dr. Bentley A. Ogoke (a pain management/palliative care specialist), and Donna M. Durocher, a Physical Therapist with HealthSouth. In addition, the Plaintiff has undergone numerous radiological studies in the affected areas, including x-rays, CT scans, MRI's, bone scans, and myelograms. In general terms, the Plaintiff's medical records pertaining to the above described spinal injuries are contained at VER MAZ pp. 57-107. It is also clear that the referenced medical records consist of both subjective complaints by the Plaintiff, and objective medical examinations, radiological studies, and other diagnostic materials. See, for example, May 28, 2002 letter from Dr. Dasco which is set forth in the record at VER MAZ 106-107, which

1190 (8th Cir. 1998)).

6

incorporates a review of the radiological studies of Mr. Mazza, his subjective complaints, and an examination by Dr. Dasco.

(c) As a result of the above described studies and examinations, the following diagnoses were reached regarding the Plaintiff's spinal injuries: thoracic disk herniation at the T10-11 level; lumbar disk herniations at both the L4-5 and L5-S1 levels causing compression of the respective thermal sacs and nerve roots, lumbar disk protrusion at the at L3-4 level; lumbar facet degenerative changes; sacroiliitus; lumbar radioculopathy; and thoracic strain. See e.g., VER MAZ pp. 106-107 (5/28/02 letter from Dr. Dasco), VER MAZ pp. 76-81 (Radiological studies/MRI's/Bone Scans/Myelograms conducted at Medical West/Riverbend Medical Group); Again, all of these studies were provided to Aetna and Verizon as part of the Plaintiff's disability application, and were ostensibly reviewed by those entities and considered as part of the decision process. See, VER MAZ pp. 26-33, pp. 39-40.

(d) In addition to the aforementioned diagnoses, each of the physicians attending to the Plaintiff both before and during his application for disability benefits stated in unequivocal terms that Mr. Mazza's back injuries were chronic, debilitating, and were causing him a tremendous amount of pain, and that he had been taking copious dosages of very powerful pain medications with little relief of his symptoms. It was further noted that the Plaintiff's pain was exacerbated considerably by his duties as a customer service assistant at Verizon. Several of the documents provided to Aetna and Verizon (and purportedly considered by them

7

in their claim review) summed up the chronic nature of the
Plaintiff's symptoms and pain, and conveyed in emphatic terms the
gravity of the situation and the unlikely chance of long term
recovery, especially as it related to the Plaintiff's ability to
continue working. For example, in his May 28, 2002 letter (VER
MAZ at 106-107), Dr. Dasco noted in relevant part as follows:

> "….Mr. Mazza has a chronic low back syndrome with mild
> radiculpathy bilaterally due to degenerative disc disease. His
> problem has frequent remissions and exacerbations….[c]ontinued
> sitting position at a desk should be avoided as it would
> aggravate his back problem….[t]here are certain periods of
> time, when he may be unable to work because of increased back
> pain aggravated by the sitting position. I see no easy solution
> to his problem, which is chronic."

In a similar vein are the consistent written opinions of the
Plaintiff's treating primary care physician, Dr. Robert Trump,
which were also made available to Aetna and Verizon for review
and consideration, and which are part of the administrative
record. See, VER MAZ pp. 85-86, pg. 92, and pp. 114-115. It
should be noted that Dr. Trump was intimately aware of the
Plaintiff's ongoing efforts regarding his disability claim, and
in fact it is clear from the tenor of several of Dr. Trump's
opinion letters that he suspected that Aetna and later Verizon
were utterly ignoring or refusing to credit his repeated written
determinations that David Mazza was totally disabled from
performing his job. In fact, based on the opening comments in his
June 10, 2002 letter to Betty Lassiter-Haskins of Aetna[4], Dr.
Trump was of the opinion that Ms. Haskins was attempting to

---

[4] Betty Lassiter-Haskins, who in 2002 was employed as a "Disability Nurse Case
Manager" at Aetna, appears to have conducted most of the first level review
and denial of the Plaintiff's disability claim.

8

misrepresent or obfuscate his unwavering medical opinion

regarding the Plaintiff's ability to work. Specifically, Dr.

Trump's letter commences as follows:

"I was unhappy to meet today with David Mazza, whom I believe,
is accurately reporting on your misunderstanding or
misrepresentation of what I informed you about when we had a
conversation, I believe, on 6/6/02 at which point I faxed you
information which was somewhat different than that which you
reported to him that I had sent"[5]. See, VER MAZ pg. 85.

Moreover, with regard to the Plaintiff's symptoms and pain,

Dr. Trump posited the following in his June 10, 2002 opinion

letter to Aetna:

"In the main, every day [the Plaintiff] functions with pain...On
an every day level, he experiences pain both in the back and as
well as radiation down into one or both thighs or sometimes from
the buttocks down the back of the legs, but on some occasions a
spontaneous experience of a kind of popping is present and
intense pain that may last as long a 2, 3, 4, or even 5 days
completely disabling him is noted. This is unpredictable, seems
to happen in intervals of 1-2, 2-3 months and has necessitated
removal of the patient from the workplace". See, VER MAZ at pg.
85.

Lastly, in assessing Mr. Mazza's likelihood of medical

improvement and return to employment, Dr. Trump was blunt in his

rather bleak assessment in that regard:

".....I do believe that periodically, [the Plaintiff] will
miss anywhere from 2-5 days in the workplace when for reasons
that I suspect will always be obscure, dynamics of back pain
change and his situation is so painful that he is not able to
actually stand, having to be lying down and/or even crawling
from place to place when taking heavier doses of narcotics". 
See. VER MAZ at pg 86.

---

[5] Dr. Trump is alluding to an Aetna boilerplate disability form which Betty
Lassiter-Haskins faxed to his office on June 6, 2002 for completion. In
succinct terms, Dr. Trump noted in hypothetical terms only that certain
accommodations might improve the Plaintiff's ability to return to work on a
trial basis. The same June 6, 2002 disability form pointed out that the
Plaintiff continued to experience "severe pain", and that Mr. Mazza's chronic
back problems had already resulted in "various absences from the workplace".
See, VER MAZ pg. 92. Also, Dr. Dasco's May 28, 2002 letter indicates that, due
to his chronic back condition, the Plaintiff had for some time been missing
days of work every few months prior to applying for disability benefits. See,
VER MAZ pg. 83.

9

The same basic sentiments were conveyed by Dr. Trump in his September 25, 2002 letter regarding the Plaintiff's "Work Related Disability" which was provided to Aetna and Verizon, and which is set out in the administrative record at, among other places, VER MAZ pp. 114-115. After postulating that the entities reviewing Mr. Mazza's disability claim should be "quite familiar with [his] current circumstances", Dr. Trump took the opportunity to reiterate the fact that, since his June 10, 2002 letter, the Plaintiff "continues to have unpredictable intense crippling kind of back pain which can occur quite inexplicably", and that "[o]n some occasions incredibly intense spasm is associated with this". See, VER MAZ pg. 114. As for the Plaintiff's disability status in September 2002, Dr. Trump again took great pains to try to insure that his comments and/or opinions on the subject would not be ignored or misconstrued. In particular, he averred in pertinent part as follows:

"Please understand that I am not equivocating here: Mr. Mazza is not presently able to work in any capacity and I don't have any knowledge as to when that status may change". See, VER MAZ at pg. 115.

Incidentally, like Dr. Dasco, Dr. Trump's medical opinions and conclusions regarding the Plaintiff's clear disability were based on not just subjective complaints, but also actual physical examinations and review of the rather extensive medical history and radiological studies at his disposal. Moreover, it is clear from the record that Dr. Trump made certain that Aetna had this background information at its disposal for purposes of deciding the claim here at issue (See,

10

VER MAZ at pg. 114), and it is equally clear from Aetna and
Verizon's internal notes that David Mazza's medical history and
other objective information (e.g. MRI/CAT Scan/Bone Scan
results) were made available to those entities. See e.g., VER
MAZ at pp. 10-23, 27-33. Whether or not this crucial
information was actually considered when those entities denied
the Plaintiff's claim(s) is a matter which will be discussed
infra.

As noted above, the Plaintiff also treated with Dr. Bentley
A. Ogoke, a pain management/palliative care physician, during
the period he applied for sickness disability benefits from the
Plan. Once again, each of the relevant reports of Dr. Ogoke
were provided to Aetna and Verizon for ostensible review with
respect to the Plaintiff's disability claim. As with Dr. Trump,
Dr. Ogoke examined the Plaintiff numerous times over a several
month period (including a comprehensive initial examination on
June 12, 2002, See VER MAZ pp. 70-73), and also reviewed his
medical history and radiological studies for purposes of
diagnosis, treatment and prognosis. See generally, VER MAZ pp.
61-73, pg. 113. In other words, Dr. Ogoke was intimately
involved in Mr. Mazza's treatment, and his opinions regarding
the Plaintiff were based on both objective and subjective
factors. Moreover, like Dr. Trump's assessments, Dr. Ogoke's
ultimate disability opinion was the culmination of the months
he spent observing and treating the Plaintiff, and his
conclusions, like most comprehensive medical findings, evolved
over that several month period.

11

However, what is clear and consistent from the outset of Dr. Ogoke's involvement with the Plaintiff as manifested in the corresponding medical records is his diagnosis of chronic and myriad disc herniation and degenerative disease, radiculopathy, and severe discogenic pain, aching, and spasms. Dr. Ogoke saw fit to treat the Plaintiff with several steroid epidural injections and prescribe numerous powerful pain medications, all in an attempt to alleviate his constant pain. As for the issue of the Plaintiff's ability to perform his employment duties, Dr. Ogoke was unequivocal in the November 7, 2002 letter which he faxed to Dr. Claudia G. Hix (a physician employed by Aetna and charged with reviewing and/or deciding the Plaintiff's appeal of the original denial of his disability claim). Specifically, Dr. Ogoke opined as follows in his letter to Dr. Hix of Aetna:

"David cannot work due to his physical impairments including the inability to sit and stand for long periods of time in a sedentary position from Lumbar Herniation at L4-5, L5-S1 and L3-4 protrusion, Lumbar Facet Degenerative Disease, Sacroilitis, Lumbar Radiculopathy, and Thoracic Strain". See, VER MAZ at pg. 113).

Lastly, with respect to his spinal injuries, the Plaintiff was also referred to a physical therapist at Healthsouth, Donna M. Durocher, who in a September 23, 2002 letter posited as follows:

"In my opinion David [Mazza] is not able to work sitting at his job @ [sic] Verizon at this time". See, VER MAZ at pg. 94.

It is also noteworthy that, among other information, each of the above cited medical documents which state in plain and

12

simple terms that the Plaintiff was disabled from performing
the duties of his occupation, were made available to reviewing
personnel at Aetna and/or Verizon, and these individuals were
in possession of or made privy to each of these documents
before deciding to deny the claim and the appeal of same. See
e.g., Notes of Dr. Claudia Hix at VER MAZ pp. 16-23, which
lists the medical evidence and information made available to
Aetna as part of the Plaintiff's claim; See also, VER MAZ 26-50
containing the narrative notes of various Aetna reviewing
personnel (labeled "Etums Member/Event Notes Report").

Aside from the above described spinal injuries and pain,
the Plaintiff's well documented medical history at all times
relevant hereto includes hypertension, dyspnea, a double hernia
repair in or about 1995, a total ACL reconstruction in or about
June 1996, nephrostomy in or about February 1998, three
angioplasties and one stent from 1995 through 1998 culminating
with quadruple bypass surgery in or about 1998. Moreover, the
Plaintiff suffered from depression, anxiety, and sleep
disturbance. It is crucial to mention that this information,
like the voluminous documentation regarding Mr. Mazza's back
injuries, was provided to Aetna and/or Verizon for presumptive
review concerning the Plaintiff's disability claim and appeal.
See e.g., VER MAZ at pg. 33.

(5) Despite the overwhelming documentation from various
physicians and medical personnel explicitly concluding that
David Mazza was fully disabled from performing the duties
incident to his employment, both Aetna and Verizon have

13

steadfastly and conveniently ignored and failed to credit the clear medical evidence indicating disability, and instead, both entities engaged in a variety of pretextual maneuvers designed to conceal their arbitrary and capricious refusal to fairly evaluate and decide David Mazza's application for sickness and disability benefits. While Verizon's summary judgment memorandum would have the court believe that an exhaustive and objective review of the Plaintiff's medical evidence took place prior to the denial of his claim, to accept their position requires that the fact finder ignore the forest for the trees. Put differently, Verizon's exhaustive references to the Plaintiff's copious medical records does not mean that they actually paid any heed to their contents. In fact, the circumstances demonstrate that Aetna and Verizon ignored the consistent opinions of David Mazza's physicians, and, as will be discussed below, the record shows that Aetna and Verizon did not have one shred of credible evidence upon which to predicate its repeated denials of the disability claim here at issue.

That being the case, Verizon and Aetna's review and ultimate denial of the Plaintiff's claim was not predicated upon a fair and objective assessment of the evidence. Rather, beginning from the Plaintiff's May 21, 2002 appeal of the disability certification denial onward, both Aetna and Verizon engaged in various slight of hand techniques in an attempt to arbitrarily and capriciously disregard or unfairly qualify the unmistakable opinions finding Mr. Mazza totally disabled. For example, the November 8, 2002 denial letter from Aetna (See, VER MAZ at pp.

14

10-13) and the internal narrative notes upon which the denial
was based all selectively ignore or refuse to accept at face
value the clear sentiments expressed by Dr. Ogoke <u>only the day
before</u> (11/7/02) that "[the Plaintiff] cannot work due to his
physical impairments including the inability to sit and stand
for long periods of time in a sedentary position". Instead,
Aetna (and later Verizon)[6] denied the instant claim for benefits
in large part based upon an undocumented November 7, 2002
telephone call from Dr. Hix to Allison St. Laurent, a
physician's assistant in Dr. Ogoke's office, wherein, after a
slew of self serving hypothetical questions posed by Dr. Hix,
Ms. St. Laurent allegedly surmised that the Plaintiff might be
able to do his job with certain accommodations. It is telling
that neither Dr. Hix or anyone else at Aetna bothered to follow
up this November 7, 2002 conversation with the actual treating
physician, to wit Dr. Ogoke, before denying the Plaintiff's
claim appeal the next day. Also, there is absolutely no
indication in the record that Ms. St. Laurent had consulted
with Dr. Ogoke before tendering her response to Dr. Hix's
hypothetical scenario, and interestingly, Dr. Hix's own notes
indicate that she faxed a summary of this purported
conversation with Allison St. Laurent to her for signing, but
that fax was never signed or endorsed by Ms. St. Laurent. See,
VER MAZ at pg. 22.

---

[6] In that Verizon's stated reasons for denying the Plaintiff's claims appeal
closely mirror (and are virtually identical to) those of Aetna, any discussion
of Aetna's conduct during their assessment of disability would apply with
equal force to the Verizon Claims Review Committee ("CRC").

15

Thus, Aetna's conduct at the exact moment it denied the
Plaintiff's claims appeal (11/8/02) can be summed up thusly:
ignore the learned and unequivocal written opinions from each
of the treating physicians finding the Plaintiff completely
disabled, (including a document generated by Dr. Ogoke the day
before), and instead rely on the responses to self-serving
hypothetical questions allegedly provided by a lay person (Ms.
St. Laurent), who by no accounts ever examined the Plaintiff,
checked his most recent records, or even consulted with Dr.
Ogoke before responding to Dr. Hix. The validity of Aetna's
reliance on the baseless opinion of a non-physician as the
primary rationale for denying the Plaintiff's claim is further
undermined by the fact that, although Dr. Hix faxed a synopsis
of the alleged conversation to try to document same, the record
indicates that the fax was never signed by Ms. Laurent nor did
Dr. Ogoke's office ever take measures to verify that such a
conversation took place. This certainly casts further
aspersions on the motives and conduct of Dr. Hix and her ad hoc
denial decision.

Likewise, Aetna and Verizon took extraordinary measures to
blithely disregard and fail to credit the consistent and
incontrovertible opinion of Dr. Trump finding that the
Plaintiff was fully disabled. In fact, it would appear from the
various passages from Dr. Trump's letters quoted above that he
was aware Aetna's review of David Mazza's claim was proceeding
in less than an objective or forthright manner. How else to
explain Dr. Trump's June 10, 2002 admonishments that Aetna