UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DAVID MAZZA,                              )
                    Plaintiff            )
                                          )
          v.                              )          Civil Action No. 04-30020-MAP
                                          )
                                          )
VERIZON SICKNESS and ACCIDENT    )
DISABILITY BENEFIT PLAN for NEW  )
ENGLAND ASSOCIATES; and          )
VERIZON COMMUNICATIONS, INC.,     )
                    Defendants           )


REPORT AND RECOMMENDATION  REGARDING THE PARTIES' CROSS
MOTIONS FOR SUMMARY JUDGMENT (Document Nos. 26 and 29)
December 22, 2005

NEIMAN, U.S.M.J.

          Pursuant to section 502(a)(1)(B) of the Employee Retirement Income Security

Act ("ERISA"), David Mazza ("Plaintiff") brings this complaint against his former

employer, Verizon Communications, Inc. ("Verizon"), and Verizon's Sickness and

Accident Disability Benefit Plan for New England Associates ("the Plan") (together

"Defendants").[1]  Plaintiff claims he is disabled and that Defendants arbitrarily and

capriciously denied his claim.  The parties have filed cross motions for summary

judgment which have been referred to this court for a report and recommendation.  *See*

28 U.S.C. § 636(b)(1)(A).  For the reasons stated below, the court will recommend that

Defendants' motion be allowed and that Plaintiff's motion be denied.

_____

          [1]  The claims against a third defendant, Aetna Casualty and Life Insurance
Company ("Aetna"), were dismissed on May 5, 2004.  (See Document No. 12.)

## I. BACKGROUND

Pursuant to the court's order dated November 22, 2004, the parties filed an Agreed Amended Record for Judicial Review. (Document No. 28. The court uses the parties' abbreviation of "VER MAZ" in referring to the record.) Based on that document, Defendants have set forth a comprehensive factual summary which, Plaintiff acknowledges, outlines the facts "upon which the parties agree." Accordingly, the court has structured this background around Defendants' summary, with appropriate references to the agreed-upon record. In so doing, the court has omitted conclusory statements, argument, or opinion. *See Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990) (explaining that "conclusory allegations, improbable inferences, and unsupported speculation" are entitled to no weight in the summary judgment calculus).

### A. RELEVANT TERMS OF THE PLAN

The Plan is "an 'employee benefit plan' within the meaning of Section 3(1) of ERISA, and an accident and health plan under Section 105 of the Internal Revenue Code of 1986." (VER MAZ at 124.) It "provide[s] for the payment of definite amounts to [Verizon's] Employees when they are disabled by accident or sickness." (*Id.*) Verizon is the Plan's sponsor and the Chairman of Verizon's Bell Atlantic Corporate Employees' Benefits Committee is the designated plan administrator. (VER MAZ at 125, 127.)

#### 1. Sickness Disability Benefits Under the Plan

Section 4.1 of the Plan sets forth the eligibility requirements for receiving sickness disability benefits. That section provides as follows:

> All Employees whose term of employment with [Verizon] is six (6) or more months shall become participants in the Sickness Disability portions of the Plan and be qualified to receive payments under the Plan on account of physical disability to work by reason of sickness. Such payments are hereinafter referred to as "Sickness Disability Benefits." Such payments shall terminate when disability ceases and shall in no case extend beyond the periods hereinafter mentioned. For the purposes of the Plan, a sickness shall include an injury other than accidental injury arising out of and in the course of employment by [Verizon].

(VER MAZ at 130.) Participants who have accrued between twenty and twenty-five years of service, such as Plaintiff, are eligible to receive sickness disability benefits in the amount of full-pay for thirty-nine weeks and half-pay for thirteen weeks. (*Id.*)

To apply for sickness disability benefits, a participant must provide notice to Verizon on his first day of absence due to disability. (VER MAZ at 135, 151.) On the eighth consecutive calendar day of absence, the participant's supervisor files appropriate papers with Aetna to commence the participant's application for sickness disability benefits. (VER MAZ at 151.) The Plan provides that sickness disability benefits "shall begin on the eighth (8th) calendar day of absence on account of disability[.]" (VER MAZ at 130.)

2. Adjudication of Benefit Claims Under the Plan

Aetna is the "Benefits Administrator" for the Plan and has responsibility for making initial determinations of claims for benefit payments. (VER MAZ at 173.) Verizon's Claims Review Committee ("CRC") is the designated "Claims and Appeals Administrator" for the Plan. (*Id.*) In this role, the CRC has "the sole authority to exercise discretion in the resolution of any initial appeal of a denied claim under the

3

Plan." (VER MAZ at 128.)  More specifically, the CRC has discretionary authority to do the following:

- Interpret the Plan[] based on [its] provisions and applicable law and make factual determinations about claims arising under the Plan

- Determine whether a claimant is eligible for benefits

- Decide the amount, form and timing of benefits

- Resolve any other matter under the Plan[] that is raised by a participant or a beneficiary, or that is identified by either the claims or appeals administrator.

(VER MAZ at 167.)  The decision of the CRC is the "final, conclusive and binding administrative remedy under the Plan." (VER MAZ at 128.)

B.  PLAINTIFF'S CLAIM UNDER THE PLAN

Plaintiff was born on June 18, 1956. (VER MAZ at 5.)  On August 1, 1979, he was hired by Verizon as a customer service representative. (*Id.*)  Plaintiff's job was sedentary in nature; it involved talking on a telephone, using a headset and working on a computer. (VER MAZ at 83.)

Plaintiff claims to have injured his back in a skiing accident when he was twenty-six years old and that his condition began to progressively worsen in 1996. (See *id.*)  According to notes of a telephone conversation between an Aetna representative and Plaintiff's supervisor, Elizabeth Mullins, Plaintiff "took a number of days off" and, hence, was suspended for several days between May 8 and 17, 2002.  Plaintiff's last day of work was May 20, 2002, when he returned for fifteen minutes but left complaining of back pain. (VER MAZ at 48.)  On May 28, 2002, Ms. Mullins notified Aetna of Plaintiff's

absence in order to initiate Plaintiff's application for sickness disability benefits under

the Plan.  (VER MAZ at 50.)  Plaintiff never returned to work and was terminated on

September 8, 2002.  (VER MAZ at 5.)

1.  Determination of Plaintiff's Initial Claim by Aetna

In determining Plaintiff's initial claim, Aetna obtained the following information:

- On June 5, 2002, Aetna contacted Dr. Demosthenes Dasco, Plaintiff's neurosurgeon, by telephone.  Dr. Dasco stated that Plaintiff suffered from lower back pain syndrome with mild radiculopathy due to degenerative disc disease, and recommended physical therapy three times a week.  However, Dr. Dasco stated that Plaintiff was capable of doing desk work provided that he be able to stand and sit as needed.  (VER MAZ at 47-A.)

- Aetna attempted to contact Dr. Robert Trump, Plaintiff's internist, on June 4, 2002, but was unable to obtain any information on Plaintiff's condition because his office was closed.  (VER MAZ at 48.)

Based on this information, Aetna denied Plaintiff's claim on June 6, 2002, stating that

he had not provided any clinical information to establish disability.  (VER MAZ at 47-A.)

After its initial denial, Aetna received additional information from Dr. Trump:

- On June 6, 2002, Aetna received a telephone call from Dr. Trump, stating that Plaintiff suffered from lower back pain and had failed physical therapy and injection therapy.  However, Dr. Trump stated that Plaintiff was able to work provided that he could stand and change positions at will.  (VER MAZ at 47.)

- Also on June 6, 2002, Aetna received a completed medical questionnaire from Dr. Trump via facsimile.  Dr. Trump noted that Plaintiff had chronic discogenic low back pain with sciatica. Nevertheless, Dr. Trump noted that Plaintiff "can return to work [with] sit/stand arrangement" that would allow him to "adjust his position at intervals that may be as often as every hour for 5-10 minutes."  "If his work would agree," Dr. Trump continued, he expected that "a trial would safely be undertaken as per our phone

5

call earlier today."  (VER MAZ at 92.)

On June 6, 2002, Aetna concluded that this additional information was "not sufficient to warrant a reversal of [its] claim decision at this level," and informed Plaintiff that he could further appeal his denial to Aetna's Disability Appeals Unit.  (VER MAZ at 47.)

2.  <u>Determination of Plaintiff's First Appeal by Aetna</u>

On July 18, 2002, Plaintiff appealed Aetna's denial of his claim and submitted additional medical information for consideration.  (VER MAZ at 74-75.)  By letter dated July 25, 2002, Aetna acknowledged receipt of Plaintiff's appeal.  (VER MAZ at 54.)  In addition to the aforementioned information from Drs. Dasco and Trump, Aetna reviewed the following:

- Various MRIs from March and August of 1998.  (VER MAZ at 76-81.)

- A discharge note from Dr. Trump dated May 20, 2002.  In it, Dr. Trump stated that Plaintiff suffered from continuing pain and that he was unable to work.  Dr. Trump, however, noted that Plaintiff needed "to be seen by a person with greater experience to do more formal evaluation."  (VER MAZ at 82.)  Dr. Trump referred Plaintiff to Dr. Dasco.  (VER MAZ at 83.)

- A letter by Dr. Dasco dated May 28, 2002.  Dr. Dasco stated that Plaintiff reported having a history of low back problems since age twenty-six and that his back pain had progressively worsened over the previous six years.  Plaintiff also reported that sitting aggravated his pain, but that he was "able to walk without too much difficulty[,]" including "going into the woods doing some shooting as a sport."  (*Id.*)  Dr. Dasco opined that Plaintiff "has a chronic low back syndrome with mild radiculopathy bilaterally due to degenerative disc disease."  Plaintiff's problem, Dr. Dasco continued, "has frequent remissions and exacerbations."  Nonetheless, Dr. Dasco concluded, Plaintiff was "capable of doing deskwork provided that he has the freedom of standing and sitting as needed."  (VER MAZ at 84.)

6

- A letter from Dr. Trump to Aetna dated June 10, 2002.  Although Dr. Trump reiterated that Plaintiff suffered from chronic low back pain, he recommended that "as a trial, [Plaintiff] might be allowed back into the workplace with a kind of sit/standing opportunity, noting that he might reposition himself at periods of time as often as several times during any given hour."  "If his workplace could accommodate to that," Dr. Trump continued, "he would certainly be able to do as a trial that job."  (VER MAZ at 85-86.)

- A referral dated June 10, 2002, by Dr. Trump to see Dr. Bentley Ogoke, a pain management specialist.  (VER MAZ at 87.)

- An initial medical evaluation by Dr. Ogoke dated June 12, 2002. Dr. Ogoke listed the following diagnoses: (1) lumbar herniation at L4-5, L5-S1, and LS-4; (2) lumbar facet degenerative disease; (3) sacroilitis; (4) lumbar radiculopathy; and (5) "thoracic strain, rule out herniation versus discogenic pain at the lower thoracic spine." (VER MAZ at 73.)  Dr. Ogoke's treatment plan included medication, physical therapy, bioelectric treatment, MRIs, and spinal injections. (*Id.*)  Dr. Ogoke did not indicate whether Plaintiff could work.

- MRI reports dated June 13, 2002, indicating a T10-11 disc bulge with effacement of L3 nerve root, left L3-4 disc herniation, left L4-5 and paracentral L5-S1 disc herniations.  (VER MAZ at 89-90.)

- A June 14, 2004, conversation that an Aetna representative had with Plaintiff's supervisor, Ms. Mullins.  Ms. Mullins stated that Plaintiff could be accommodated with a standing and sitting arrangement.  Specifically, Ms. Mullins reported, Plaintiff could stand and move around his workstation wearing a headset with a long cord.  In addition, she noted that Plaintiff had been provided with an ergonomically appropriate workstation and chair before his absence.  (VER MAZ at 44.)

- Procedure notes indicating that Plaintiff received epidural steroid injections on July 23, August 20, and September 17, 2002.  (VER MAZ at 61, 66, 68.)

- Office notes from Dr. Ogoke with respect to follow-up visits by Plaintiff on July 1, August 7, September 3, and September 13, 2002.  (VER MAZ at 62-65, 67, 69.)  Although Plaintiff still reported lower back pain, Dr. Ogoke noted that medical treatment had a

positive effect on his condition. Specifically, Plaintiff reported that he had a good response to injection therapy. His physical therapist, Donna Desrocher, also reported that he was "obtaining good relief" with physical therapy. (VER MAZ at 62, 64.)

- A September 6, 2002 facsimile to Aetna, in which Plaintiff confirmed that he "now [has] some relief on some of the pain and [his] breathing is better." (VER MAZ at 96.)

- A September 23, 2002, letter from Ms. Desrocher who opined that Plaintiff was "not able to work sitting at his job [at] Verizon - at this time." (VER MAZ at 94.)

- A letter from Dr. Trump dated September 25, 2002. Dr. Trump noted that Plaintiff continued to report severe back pain. Dr. Trump also stated that Plaintiff was undergoing physical therapy with some improvement, and that injection therapy "provided significant benefit[.]" (VER MAZ at 57.) Dr. Trump noted as well that "some of this improvement may be secondary to pharmacologic manipulation and not indeed physical improvement on [Plaintiff's] part." (*Id.*) He opined that Plaintiff "is not presently able to work in any capacity and I don't have any knowledge as to when that status may change." (VER MAZ at 58.)

- A November 7, 2002 conversation between an Aetna representative and Dr. Ogoke's physician's assistant, Allison St. Laurent. Ms. St. Laurant indicated that Dr. Ogoke did not complete any disability forms for Plaintiff. She also did not know whether Dr. Ogoke was aware that Plaintiff's employer would accommodate him with an ergonomically correct workstation and allow him to change his position as necessary. When asked whether Plaintiff was capable of work with these accommodations, Ms. St. Laurant responded that Plaintiff could work at least part-time so long as he could alternate between sitting and standing as needed. (VER MAZ at 22.)

- Plaintiff's claim file, which was forwarded to Aetna's medical director, Dr. Claudia Hix, for review. Dr. Hix noted on August 12, 2002, that on or around May 28, 2002, Plaintiff was able to hunt which "involves walking, stationary positions, sitting, laying on the ground or in a blind, bending, stooping, squatting, reaching to shoulder height, and occasionally climbing." "By extension," Dr. Hix continued, "it could be expected that [Plaintiff] would be able to

sit at a desk with frequent changes of position for some period of time during the workday." (VER MAZ at 15.) Dr. Hix also found that Dr. Ogoke's examination of Plaintiff in June of 2002 was consistent with Dr. Dasco's May 28, 2002, evaluation, which indicated that Plaintiff could work. With respect to Dr. Trump's September 25, 2002, letter stating that Plaintiff was incapable of work, Dr. Hix found that the letter contained "subjective information only." (VER MAZ at 17.) Dr. Hix also later noted that Ms. St. Laurent opined on November 7, 2002, that Plaintiff was able to work. (VER MAZ at 16.) In addition, Dr. Hix stated that there may be a possibility of misrepresentation by Plaintiff based on inconsistencies in the documentation provided by his physicians. (VER MAZ at 17-18.)

Based on the foregoing information, Aetna denied Plaintiff's appeal on November 8, 2002, stating that "[t]he clinical information does not support an inability to perform your sedentary occupation with restrictions and previously made accommodations by your employer." (VER MAZ at 13.) In conclusion, Aetna stated that "[t]here was no objective evidence provided to indicate that you were physically unable to perform sedentary work." (*Id.*)

3. Determination of Plaintiff's Final Appeal by the CRC

By letter dated December 9, 2002, Plaintiff appealed Aetna's denial of his claim to the CRC. (VER MAZ at 5, 108-15.) In support, Plaintiff submitted an additional letter from Dr. Ogoke dated November 7, 2002. In it, Dr. Ogoke stated that Plaintiff "cannot work due to his physical impairments including the inability to sit and stand for long periods of time in a sedentary position from Lumbar Herniation at L4-5, L5-S1 and L3-4 protrusion, Lumbar Facet Degenerative Disease, Sacroilitis, Lumbar Radiculopathy, and Thoracic Strain." (VER MAZ at 113.)

Verizon forwarded Plaintiff's file to Dr. Rukhsana Sadiqali for her independent

medical review.  In a report dated January 13, 2003, Dr. Sadiqali made the following

observations:

- On May 28, 2002, Dr. Dasco found that Plaintiff "was capable of performing desk duty with ability to sit and stand as needed."  (VER MAZ at 8.)

- On June 6, 2002, Dr. Trump "stated that [Plaintiff] was able to work at his job as long as he was able to stand and change his position at will.  When contacted, [Plaintiff's] supervisor indicated that the employee worked at an ergonomically correct workstation where he was able to stand and move around.  He was also accommodated with a headset with a long cord."  (*Id.*)

- Dr. Ogoke's office notes indicated that epidural injections and physical therapy "had resulted in improvement of [Plaintiff's] symptoms, . . . [but] did not indicate that [Plaintiff] needed to be out of work[;] nor did [the notes] address [Plaintiff's] functional capacity."  (*Id.*)

- On November 7, 2002, a physician's assistant in Dr. Ogoke's office "indicated that [Plaintiff] was able to work, at least part time, as long as he could alternate sitting and standing as needed."  (*Id.*)

- Although Dr. Trump and Dr. Ogoke stated that Plaintiff could not work in their September 25 and November 7, 2002 letters, these opinions were not based on "objective clinical information to warrant disability."  (*Id.*)

Based on this review, Dr. Sadiqali concluded that, "[a]lthough [Plaintiff] did have back

pain, there is no objective information to support [his] inability to do the job with the

recommended accommodations."  (VER MAZ at 9.)

By letter dated February 4, 2003, the CRC upheld the denial of Plaintiff's claim.

(VER MAZ at 3.)  The CRC found that on May 28, 2002, "Dr. Dasco noted that [Plaintiff]

was capable of doing desk duty with the ability to stand and sit as needed."  (VER MAZ

at 2.)  The CRC also found that on June 6, 2002, "Dr. Trump stated that [Plaintiff] could

return to work as long as he had the ability to sit and stand when necessary." (*Id.*) In addition, the CRC noted that Dr. Ogoke's examination on June 12, 2002, indicated that Plaintiff's "sensory, motor, and power of upper extremities and lower extremities were within normal limits," and that his "concentration, judgment, coordination, and balance were good." (*Id.*) Furthermore, the CRC observed that Dr. Ogoke's September 3, 2002 office note indicated that Plaintiff had a positive response from injection therapy. The CRC emphasized that Dr. Ogoke's records did not contain any opinions whether Plaintiff needed to be out of work. (VER MAZ at 2-3.)

The CRC also considered and addressed the opinions of Ms. Desrocher, Dr. Trump, and Dr. Ogoke that Plaintiff was unable to work. With respect to Ms. Desrocher's September 23, 2002, letter, the CRC found that she "did not provide any clinical evidence to support her recommendation." (VER MAZ at 3.) Similarly, the CRC believed that Dr. Trump's September 25, 2002, letter was based only on subjective information provided by Plaintiff. (*Id.*) Likewise, the CRC concluded that Dr. Ogoke's November 7, 2002, letter lacked evidence "to substantiate a total disability from [Plaintiff's] own occupation." (*Id.*) Accordingly, the CRC concluded that Plaintiff was not entitled to disability benefits for the period commencing on May 28, 2002.

C. PROCEDURAL HISTORY

On February 2, 2004, Plaintiff filed the instant three-count complaint against Verizon, the Plan and Aetna. Only Count I against Verizon and the Plan remains.[2]

---

[2] Counts II and III targeted Aetna and have been dismissed. Count I appears to be directed only on Verizon, but the parties have construed it as targeting both Verizon and the Plan. The court does likewise.

That count alleges that the denial of Plaintiff's claim for sickness disability benefits was "arbitrary and capricious" and, therefore, in violation of Section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B). In due course, the remaining parties filed the instant cross motions for summary judgment and the court heard oral argument.

## II. STANDARD OF REVIEW

When ruling on a motion for summary judgment, the court must construe the facts in a light most favorable to the nonmoving party. *Benoit v. Tech. Mfg. Corp.*, 331 F.3d 166, 173 (1st Cir. 2003). Summary judgment is appropriate when "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). For this purpose, an issue is "genuine" when the evidence is such that a reasonable fact-finder could resolve the point in favor of the nonmoving party, and a fact is "material" when it might affect the outcome of the suit under the applicable law. *Morris v. Gov't. Dev. Bank*, 27 F.3d 746, 748 (1st Cir. 1994). The nonmoving party bears the burden of placing at least one material fact into dispute after the moving party shows the absence of any disputed material fact. *Mendes v. Medtronic, Inc.*, 18 F.3d 13, 15 (1st Cir. 1994) (discussing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

The mere fact that both parties move for summary judgment does not change the foregoing analysis. *United Paperworkers Int'l v. Int'l Paper Co.*, 64 F.3d 28, 32 n.2 (1st Cir. 1995). Barring special circumstances, a court must consider each motion separately, drawing inferences against each movant in turn. *Equal Employment Opportunity Comm'n v. Steamship Clerks Union, Local 1066*, 48 F.3d 594, 608 n.8 (1st

12

Cir. 1995).  "If, after viewing the record in the non-moving party's favor, the Court

determines that no genuine issue of material fact exists and the moving party is entitled

to judgment as a matter of law, summary judgment is appropriate."  *Papadopoulos v.*

*Hartford Life Ins. Co.*, 379 F. Supp. 2d 117, 123-24 (D. Mass. 2005).

III.  DISCUSSION

The single remaining claim, Count I, alleges a violation of section 502(a)(1)(B) of

ERISA which allows a participant or beneficiary to bring an action "to recover benefits

due to him under the terms of his plan, to enforce his rights under the terms of the plan,

or to clarify his rights to future benefits under the terms of the plan."  29 U.S.C. §

1132(a)(1)(B).  As to that claim, "[t]he parties agree that the arbitrary and capricious

standard of review is applicable, as that standard is defined in *Sullivan v. Raytheon*

*Co.*, 262 F.3d 41, 50 (1st Cir. 2001), *Terry v. Bayer Corp.*, 145 F.3d 28, 40 (1st Cir.

1998), and other governing First Circuit case law."  (Document No. 23.)  The parties

also appear content to have the court decide this case via these cross motions for

summary judgment.[3]  After first discussing a procedural issue with respect to Verizon,

the court will conclude that the CRC's decision was not arbitrary and capricious.

A.  VERIZON

As an initial matter, Defendants point out that Verizon, as Plaintiff's former

---

[3]  That being said, Plaintiff argues in the alternative "that there are genuine issues of material fact that preclude summary judgment in favor of [Defendants]." (Plaintiff's Motion at 2.)  Still, Plaintiff concedes that "the parties have . . . requested that the court treat their respective summary judgment motions as dispositive."  (*Id.* at 1-2.)  Moreover, Plaintiff has not presented the court with any concrete example of a genuine issue of material fact.  It is also worth noting that Plaintiff's initial claim for a jury trial has been stricken.

employer, is not a proper ERISA defendant. *See Terry*, 145 F.3d at 36 (noting that the proper party in section 502(a) action is the entity that controls administration of the plan itself). Plaintiff conceded the point at oral argument. At the very least, therefore, the court will recommend that summary judgment enter in Verizon's favor.

B. DEFENDANTS' MOTION

As to the merits, Defendants' motion notes the claims history and maintains that the CRC's denial of Plaintiff's claim was not arbitrary and capricious as a matter of law. As might well be expected, Plaintiff disagrees with Defendants' assessment. For its part, the court finds Defendants' position more persuasive.

1. Legal Standard

Under the arbitrary and capricious standard, the ERISA plan administrator's decision must be upheld if "it is reasoned and supported by substantial evidence." *Gannon v. Metro. Life Ins. Co.*, 360 F.3d 211, 212-13 (1st Cir. 2004). The question is "not which side [the court] believe[s] is right, but whether [the administrator] had substantial evidentiary grounds for a reasonable decision in its favor." *Matias-Correa v. Pfizer, Inc.*, 345 F.3d 7, 12 (1st Cir. 2003). The arbitrary and capricious standard also requires the court "to look exclusively to the administrative record relied upon by the [administrator] in reaching its conclusion." *Downey v. Aetna Life Ins. Co.*, 2003 WL 21135710, at *12 (D. Mass. May 12, 2003) (citing, *inter alia*, *Doe v. Travelers Ins. Co.*, 167 F.3d 53, 58 n.3 (1st Cir. 1999)). *See also Lopes v. Metro. Life Ins. Co.*, 332 F.3d 1, 5 (1st Cir. 2003) ("Review of the administrative record for reasonableness logically implies review of the record available to the plan administrator; it is anomalous to

14

suggest that an administrator acted unreasonably by ignoring information never presented to it.") (citation and internal quotation marks omitted).  As mentioned, the parties here have agreed upon the administrative record.

    2.  Analysis

    The question before the CRC was whether Plaintiff was disabled as of May 28, 2002, the date of his initial claim.  On February 4, 2003, the CRC effectively said "no" and denied Plaintiff's appeal.  In the court's view, this determination was not arbitrary and capricious.  In making this recommendation, the court follows the parties' lead and divides the pertinent medical information into two time periods: (1) the period extending from May 28, 2002, through September 8, 2002, the date of Plaintiff's discharge; and (2) the period following his discharge.[4]

    a.  *Pre-discharge Information*

    In the court's view, the pre-discharge medical information unequivocally supported the CRC's decision that Plaintiff was not disabled.  First, in a letter dated May 28, 2002, Plaintiff's neurosurgeon, Dr. Dasco, concluded that Plaintiff, although obviously injured, was able to work.  In his letter, Dr. Dasco noted that Plaintiff was "able to walk without too much difficulty and has been going into the woods doing some shooting as a sport."  Dr. Dasco then opined that Plaintiff was "capable of doing deskwork provided that he has the freedom of standing and sitting as needed."  The

---

    [4] This dividing line derives from the Plan itself which provides that a participant does not have any "right or claim to any benefit or allowance after discharge from the service of [Verizon], unless the right to such benefit has accrued prior to such discharge."  (VER MAZ at 135.)  This provision is discussed more fully below.

next week, in a June 5th conversation with an Aetna representative, Dr. Dasco reaffirmed his conclusion that Plaintiff was able to work with a sit and stand accommodation. The CRC specifically relied upon these opinions in denying Plaintiff's claim.

Second, the CRC emphasized that on June 6, 2002, Dr. Trump, Plaintiff's treating internist, concluded that Plaintiff "could return to work as long as he had the ability to sit and stand when necessary." Dr. Trump repeated that statement in a telephone conversation with an Aetna representative that very day. Then, in a letter dated June 10, 2002, Dr. Trump recommended that "as a trial, [Plaintiff] might be allowed back into the workplace with a kind of sit/standing opportunity, noting that he might reposition himself at periods of time as often as several times during any given hour." "If his workplace could accommodate to that," Dr. Trump continued, "he would certainly be able to do as a trial that job." Moreover, on June 14, 2002, Plaintiff's supervisor stated that Plaintiff could be accommodated with a standing-sitting arrangement, *i.e.*, he would be allowed to move around his workstation using a headset with a long cord.

Third, office notes from Dr. Ogoke, Plaintiff's pain management specialist from mid-June to mid-September, 2002, support the denial of Plaintiff's claim. As the CRC observed, Dr. Ogoke did not mention in any of those notes that Plaintiff needed to be out of work. On the contrary, the notes indicated that Plaintiff was experiencing positive results with physical therapy and epidural injection treatment. Similarly, on September 6, 2002, Plaintiff himself stated that with the treatment he was receiving

16

from Dr. Ogoke's office, he "now [has] some relief of some of the pain and [his] breathing is better." In short, in this court's estimation, the pre-discharge information more than adequately supports the CRC's conclusion that Plaintiff was not entitled to sickness disability benefits under the Plan.

b. *Post-discharge Information*

Following his discharge, Plaintiff presented three pieces of medical information purporting to bolster his appeal to the CRC: (1) the September 23, 2002 letter from Plaintiff's physical therapist, Ms. Desrocher, in which she opined that Plaintiff was "not able to work sitting at his job [at] Verizon - at this time"; (2) Dr. Trump's September 25, 2002 letter in which he opined that Plaintiff was presently unable to work; and (3) Dr. Ogoke's letter dated November 7, 2002, in which he stated that Plaintiff "cannot work due to his physical impairments including the inability to sit and stand for long periods of time in a sedentary position . . . ." Unfortunately for Plaintiff's cause, the CRC was not swayed and, as indicated, denied his appeal. In the court's view, this decision was not arbitrary and capricious, even in light of the post-discharge medical information.

For one thing, the CRC gave reasonable explanations for rejecting the opinions of Ms. Desrocher, Dr. Trump and Dr. Ogoke. *See Gannon*, 360 F.3d at 212-13 (plan administrator's decision must be upheld if "it is reasoned and supported by substantial evidence"). With respect to Ms. Desrocher, the CRC found that she "did not provide any clinical evidence to support her recommendation." Similarly, as described, the CRC believed that Dr. Trump's September 25, 2002 letter was based only on subjective information provided by Plaintiff. Likewise, as indicated, the CRC concluded that Dr.

17

Ogoke's November 7, 2002 letter lacked evidence "to substantiate a total disability from [Plaintiff's] own occupation."

To be sure, another administrator might have reached a different conclusion had it been in CRC's position.  As indicated, however, the appropriate question is not which side the court believes might have had the better argument at the time, but whether the administrator "had substantial evidentiary grounds for a reasonable decision in its favor."  *Matias-Correa*, 345 F.3d at 12.  That certainly appears to be the case here.  For example, Dr. Ogoke's November 7th assessment was particularly conclusory.  His opinion that Plaintiff was unable to work appears to be based only on the following subjective criteria: (1) that Plaintiff "has been on numerous medication[s]"; (2) that while Plaintiff initially "reported shortness of breath when he has back spasms," he "has not reported pleuritic chest pain"; and (3) that, on June 12, 2002, Plaintiff "indicated he was out of work . . . due to pain."  (VER MAZ at 113.)  In addition, Dr. Ogoke's November 7th assessment was at odds with what his physician's assistant stated that very day, *i.e.*, that Plaintiff *could* work with an appropriate sit-stand option.

Further, and perhaps more importantly, the CRC's decision was grounded in Dr. Sadiqali's January 13, 2003 opinion that, although Plaintiff had "back pain," there was "no objective information to support [his] inability to do the job with the recommended accommodations."  As Plaintiff must acknowledge, the lack of objective medical evidence can be fatal to a claim for ERISA benefits.  *See, e.g.*, *Boardman v. Prudential Ins. Co. of Am.*, 337 F.3d 9, 17 n.5 (1st Cir. 2003) (finding it proper for administrator to require "objective evidence that [her] illnesses rendered her unable to work"); *Ivy v.*

18

*Raytheon Employees Disability Trust*, 307 F. Supp. 2d 301, 308 (D. Mass. 2004)

(deeming it reasonable for administrator to request objective medical evidence);

*Downey*, 2003 WL 21135710, at *15 (treating physicians' conclusory statements that

plaintiff was disabled, unsupported by objective medical evidence, as insufficient to

establish an inability to work).

Granted, Dr. Sadiqali was not a treating physician.  Moreover, her opinion

contrasts with what Dr. Trump and Ms. Desrocher were saying in late September as

well as with Dr. Ogoke's November 7th letter.  But there is no evidence that Dr. Sadiqali

was unreliable.  Accordingly, the CRC had discretion to credit Dr. Sadiqali over these

treating sources.  As the Supreme Court recently stated, "courts have no warrant to

require administrators automatically to accord special weight to the opinions of a

claimant's physician; nor may courts impose on plan administrators a discrete burden

of explanation when they credit reliable evidence that conflicts with a treating

physician's evaluation."  *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834

(2003).  The First Circuit, too, has upheld numerous decisions denying disability

benefits despite contrary opinions by treating sources.  *See, e.g., Gannon*, 360 F.3d at

216 ("[I]t is not [the court's] role to evaluate how much weight an [administrator] should

have accorded the opinion of an independent medical consultant relative to the

opinions of a claimant's own physicians."); *Matias-Correa*, 345 F.3d at 12 (rejecting

plaintiff's argument that administrator "should have given more weight to her doctors'

diagnoses" where independent medical reviewer concluded she could work for limited

periods of time); *Leahy v. Raytheon Co.*, 315 F.3d 11, 19-21 (1st Cir. 2002) (upholding

denial of disability benefits despite opinions of treating physicians to the contrary).

Finally, even assuming that Plaintiff's disability was somehow *established* by the assessments of Dr. Trump and Ms. Desrocher in late September and/or by the opinion of Dr. Ogoke in early November, Plaintiff could not recover under the Plan. As described *supra* at n.4, the Plan provides that an individual does not have any "right or claim to any benefit or allowance after discharge from the service of [Verizon], unless the right to such benefit has accrued prior to such discharge." Plaintiff was discharged on September 8, 2002, and, as described, there is no evidence that he was entitled to the Plan's sickness disability benefits prior to that date. Indeed, both Ms. Desrocher and Dr. Trump qualified their "no work" assessments on September 23 and 25, 2002, by stating that they applied "at this time" or "presently." Accordingly, Plaintiff had in no way demonstrated that his eligibility for benefits accrued prior to September 8, 2002. As a result, and for the other reasons described, the court will recommend that Defendants' motion for summary judgment be allowed.

C. Plaintiff's Motion

The court will further recommend that Plaintiff's cross motion for summary judgment be denied. In doing so, the court will attempt to put to rest what appear to be three main arguments in his motion.

First, Plaintiff alleges the CRC should have adopted the later reports of his treating sources (that he could not work) and should have rejected as "stale" their earlier reports (which implied that he could). In pursuing this argument, Plaintiff relies on *Jorstad v. Connecticut Gen. Life Ins. Co.*, 844 F. Supp. 46 (D. Mass. 1994), which,

20

in Plaintiff's words, "set forth *dicta* indicating . . . that the most germane medical evidence is that which addresses the claimant's condition at the point in time closest to when a disability decision is being made." (Plaintiff's Brief at 22.) Plaintiff, however, misinterprets *Jorstad*. The court there *rejected* the plaintiff's argument that the administrator failed to consider evidence of her physical condition in 1988, reasoning that such evidence was *irrelevant* to her disability status in the fall of 1986, the time from which she sought disability payments. *See id.* at 56. In other words, *Jorstad* not only supports Defendants' argument here but the Plan language as well, *i.e.*, that the critical date is May 28, 2002, the date Plaintiff's disability allegedly commenced. At that time, as described, there was strong evidence from Plaintiff's treating internist and neurosurgeon that Plaintiff could work.

Second, Plaintiff argues that Defendants should have "expend[ed] the minimal effort to have a physician or expert of their choosing meet with [Plaintiff] and do a real, honest to goodness, old fashioned physical examination." (Plaintiff's Brief at 26-27.) Plaintiff, however, cites no decision supporting this statement. At best, Plaintiff appears to imply that his argument is supported by *House v. Paul Revere Life Ins. Co.*, 241 F.3d 1045, 1048 (8th Cir. 2001). Simply put, it is not. In fact, Plaintiff concedes that "the law [does not] require[] an administrator to automatically send claimants to IME-like evaluations in order to avoid liability." (*Id.* at 26 n.7.) Perhaps more to the point, Plaintiff does not even acknowledge in his brief the existence of Dr. Sadiqali's report, let alone attempt to refute her findings and conclusions in January of 2003 that Plaintiff could work.

21

Finally, Plaintiff argues that the denial of his claim was arbitrary and capricious because the CRC failed to consider the "cumulative" effect of a number of medical ailments, in addition to his back condition.  At most, however, the record contains Dr. Ogoke's June 12, 2002 report in which he simply noted that Plaintiff "admits to depression[,] anxiety [and] [s]leep disturbance" and to a "past surgical history," i.e., "quadruple bypass in December of 1998, reconstructive surgery of the ACL in June of 1996, a double hernia operation in May of 1995, a nephrostomy in February of 1998, three angioplasties and one stent in 1995-1998."  While interesting, this brief reference, in the court's estimation, provides insufficient support to alter the CRC's decision.  As Defendants note, Plaintiff failed to submit any medical evidence with respect to these "other" ailments to the CRC.


IV.  CONCLUSION

For the foregoing reasons, the court recommends that Defendants' motion for summary judgment be ALLOWED and that Plaintiff's cross motion for summary judgment be DENIED.[5]

_____

[5]  The parties are advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to these findings and recommendations must file a written objection with the Clerk of this Court **within ten (10) days** of the party's receipt of this Report and Recommendation.  The written objection must specifically identify the portion of the proposed findings or recommendations to which objection is made and the basis for such objection.  The parties are further advised that failure to comply with this rule shall preclude further appellate review by the Court of Appeals of the District Court order entered pursuant to this Report and Recommendation.  *See Keating v. Secretary of Health & Human Services*, 848 F.2d 271, 275 (1st Cir. 1988); *United States v. Valencia-Copete*, 792 F.2d 4, 6 (1st Cir. 1986); *Scott v. Schweiker*, 702

DATED:  December 22, 2005

                             /s/ Kenneth P. Neiman
                             KENNETH P. NEIMAN
                             U.S. Magistrate Judge

---

F.2d 13, 14 (1st Cir. 1983); *United States v. Vega*, 678 F.2d 376, 378-379 (1st Cir. 1982); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603, 604 (1st Cir. 1980).  *See also Thomas v. Arn*, 474 U.S. 140, 154-55 (1985).  A party may respond to another party's objections within ten (10) days after being served with a copy thereof.